This case on the docket is 518-0269. Are you ready? Mr. Litz? Yes, good morning, Your Honor. Assistant Attorney General Carl Elitz for the Illinois Department of Transportation. Your Honor, there's two issues in this case. I think my opponent has conceded the first issue on page 4 of his brief. There's been no taking by the Department of the billboard. That is an issue in this case. The court should reverse the circuit court's judgment in favor of the plaintiff on count 1, the takings count. If there are no questions, I'll turn to the second issue. No words, no money is due. No money is due. The judgment, though, says that there was a taking, so that needs to be reversed. Well, it's just not an issue, it appears to me. Since there was a preliminary injunction. Yes, Your Honor. Against any taking. The Department was concerned that there was a judgment entered against it, and so I wanted to point that out. So it would be your request to have that reversed. Yes, please. Thank you. Perfect, thank you. Yes, I think it would be more appropriate to vacate it. Yes, Your Honor. So the second issue, then, is the mandamus issue. Mandamus is granted to a plaintiff only when the plaintiff can show a clear legal right to something, a duty on the part of the government and authority on the part of the government to grant it. It's our contention that the plaintiff in this case did not establish a clear duty with regard to the red tag permit it had on its former billboard. The billboard was blown over in a windstorm in, I believe it was 2011 now. It's been a long time. Dusty's erected. Is the sign still up? I believe so, yes, Your Honor. I didn't check it out myself, but I talked to the opposing counsel, and we seem to think that it's probably still up. So the billboard was, after the windstorm, in a horizontal position, and Dusty sent a work crew out, and they raised the billboard from a horizontal position back to an original vertical position. So those facts aren't in dispute. No, there's very few facts that are here. Okay. And there was no new construction involved, essentially. Well, I guess I need to be careful with the construction word, but no replaced or new construction items added? Well, there was bracing added, which was new. The original uprights were used, but there was additional value added to it. I think the record establishes that there was added value to the sign in the sense that their brief acknowledges that they put supports on the sign as well. They say it's for the protection of the public and workers. But if we're parsing things, which obviously we are, you wouldn't say that there was any 60 percent of the replaced parts would approach that, and that you're talking about the bracing. Okay. Since the statute only addresses the uprights and the argument we made below only dealt with the uprights, I'll confine the arguments I'm making to the uprights. Okay. So we're really not in a factual dispute. No, there's not. And in fact, my brief doesn't lay this out clearly, but this was cross motions for summary judgment. So there are no disputes of fact. And I think my opponent would agree that they erected this sign in violation of the statute, but for the fact that there's an exception. So we're just arguing about whether that exception applies to this particular case. And it's my argument that because Dusty's took a sign that was vertical, of course, that had been blown over horizontal and replaced it back to a vertical position, that what they did was they did not make out the exception. Is there any question about how it became horizontal? It was an act of God. Shall we say it was blown down? I think a storm is a classic act of God. So, yes. Why a storm was able to knock an eight-post sign over is a different question. I don't know what the state of the sign was at the time the storm blew through. No, but there's no factual issue about that. No, because our position is essentially just a mathematical one. We count up the number of uprights the sign has. If the operator replaces more than 60 percent of those uprights, then there has been something that is not normal maintenance or repair. Was that 50 percent of the sign or 50 percent of the uprights? 60 percent of the uprights. Okay. So this is an eight-post sign, and I did the math on that. I think five gets them over the limit. But it doesn't matter because they acknowledge that there were eight posts. They restored, I would agree, they restored the eight posts to the original location. There's a dispute about this. If they knocked a few posts out, they'd be okay. I'm sorry? They could knock a few out of monitor and be okay. Yes, and I asked the Department to fill me in on how typical this is, and there's apparently over 600 signs in the state. This act was passed in 1971, Your Honors. I don't care about that. I'm just trying to answer that. The purpose of the act was to clear the roadways of advertising that are not in business areas. Correct. We're going to do anything we can to find out how to get rid of those signs. Correct. The signs are supposed to atrophy and be removed, and they're not being removed. But when one does blow down, like this one does, the Department's position is you can't re-erect it if more than 60 percent of the uprights in a wooden sign have been blown down. What would we do about the Keller case, then, that still is out there? Keller was decided before the act was amended. I'm aware of that, but it references, it has some very interesting language at the end. First of all, as you say, it was basically, the argument was that below, and that the appellate court agreed with, is that the rules of IDOC could not exceed the statutory language. But it did not seem to decide the case on that basis because what it talked about was a statute, and let me go back a little bit, the facts were very similar to the facts here, except that it was an act of God and it was blown down and basically put back up, except that there they were metal structures, I believe. And also they used new material. But let me get to my point, because my point was is that the court referenced a Carolina statute that had a 50 percent rule, I think it said. And they seem to, our court, and Justice Welch recalls this better than I, since he was part of the decision in, what was it, 84 or 85? Well, I think that's what it was, it was 84. It says that it seems highly unlikely that the general assembly intended to allow the repair of a sign that suffered less than 50 percent damage through the neglect of the owner while prohibiting the replacement of a sign that was completely destroyed by an act of God through no fault of the owner. So what that says to me, that these percentages are basically immaterial if it's an act of God, because if the sign here had gone up to 60 percent or right below the 60 percent through negligence, it could have been replaced, and under your reading of the statute, that it could not be replaced if an act of God knocked it over and it was merely set back up. And this clearly says, no, we are fine with that. That's not what the legislature intended. And the general assembly reconsidered that statute, amended that statute, did not make a provision for an act of God, and added the language that the court said it would not be willing to act on the Department's position without amendment. It did not clarify then what replace is and that a repair. And that's what I read this as pointing to, is that it would relate more to repair being something that was a neglect that needed a maintenance repair, and that's where the percentages come in rather than an act of God. And that's my reading. I should point out, though, that in the Keller decision, we acknowledge that there wasn't a restoring of the materials that had been knocked over. What the Keller plaintiffs did was they restored the entire sign. So, yes, that's true. But that's a distinction between the Keller case and this case. Our case really involves a different scenario, which is them taking the sign that has, you know, been knocked over and just completely wrecking it. It seems to be more of an act of God, that they're just basically lifting something up and not really altering it. But, Your Honor, how is it that the purposes of the act can be advanced if that's the way the statute is read? If the statute is read that way, then we're never going to clear the highways and the billboards. It's just never going to happen. The act, I understand from this case and the reading of some of the dictionary meanings of replace could mean that replace means to make different, make a new, in some way improve, rather than repair in the sense that it's basically putting the property back together exactly the way it had been. Two points, if I may. Subsequent to Keller, the Supreme Court decided outcome. And outcome establishes that the purpose of the act is to beautify the state's highways and create vistas. Keller says that it has a problem with that as a statutory goal. But the Supreme Court has made it clear that's a proper statutory goal. So now we know that that's the statutory goal. The second question is, well, how is it that we can allow sign owners to get the fair use of their sign but also clear the highways of billboards that are not in areas zoned for billboards, essentially? And the answer is there has to be some mechanism to advance that statutory goal. And Keller said the mechanism can't be related to percentages of uprights. And the General Assembly said post outcome, yes, it can be, post Keller as well. The Department can use the uprights as the test of whether the sign needs to be removed. However, they did not go further and give us a definition of what replace means. I can't be sure, Your Honor. But I know that the Keller reasoning doesn't hold up now that we have the Supreme Court saying beautification is the purpose. And we also have the General Assembly saying the Department can use the uprights and the percentage of uprights as the test for measuring when a sign has to come down. Well, except that we always knew that the purpose of the statute was beautification. Well, Keller suggests that there's some confusion as to why the General Assembly would want to do this. In its first couple paragraphs, it says it's not sure. And the Supreme Court said, no, this is really about making the State's highways free of these billboards. The second point I'd like to make is, yes, you're correct about two different understandings of the word replace. There are two dictionary definitions, at least, of the word replace. One means, and the first one means, to restore to a former location or position. And that is exactly what Dusty's did, because they took the horizontal billboard and they made it vertical, restoring it to its former location and position. Now, also, there's another definition of replace, which means to substitute, typically new material for old. That's what happened in Keller. And we agree that if they had substituted new material for old, post the amendment to the statute, post outcome, then they would have violated the Act as well. But what they did here, they say, is not a violation because they didn't substitute new for old. So they'll give us the point that if they had used new material, then they would say we probably violated the Act. But we didn't use new material. We were very careful to use the posts that were there that had been blown over. And my argument is, just based on the definition of the word replace, the word replace means to restore to a former location or position. Unfortunately, I didn't cite to a Supreme Court case that I found subsequently from 1944 where the Court said it's not relevant to posts or signs. But the Court does say that replace can mean restore to a former location or position, which is the dictionary definition that we're arguing. So you're saying that it fits into the public policy that luck basically is part of the policy. So if you... Bad luck. Bad luck. Yeah, well, exactly. Bad luck. Luck. In this sense, bad luck. So that promotes the public policy. The public policy is to remove these billboards. And one of the ways that they can be removed is if they're destroyed, if they're on the ground, then the Department will reach out and say, look, we're sorry you've had this lost. We'll offer you compensation because the statute does say that that's what should happen. And we did that. And that's the way this should have been resolved. They should have been compensated for the sign that was destroyed. Instead, they essentially re-erected the sign. It's been there for eight years now. It seems like it will never come down. We think that in these situations when signs are destroyed, if they can't be restored by using less than 60 percent of the uprights, then that triggers the act. And this is the case that should establish that. I don't know that I have any other points. I wanted to make sure we talked about Keller. I think the preliminary injunction count takes care of itself. The 1944 case, did you know? Oh, I didn't give the site to that. I was going to say, did you file a motion to supplement? No, and I will, Your Honor. But as I said, it just points out that a definition of replaced means to restore the former location. I'll give the Court a site. Well, you need to do that, but maybe. No. Well, I mean, if there's going to be an argument regarding it, we need to be open to making an argument about replacing the original location. Okay. So you make an oral motion to supplement the record. I'd like to do that, Your Honor. And we'll grant that, but we need to give the other side an opportunity to respond. Certainly. Can I give you the site? Just a moment. Thank you. You go ahead now and give us the citation and the name of the case, please. It's Illinois Central Railroad Company v. Franklin County. Wait a minute. Illinois Central Railroad v. Franklin County? Yes. It's 387 Illinois 301. And that's 1944. 387 Illinois 301. Okay. And do you want me to pronounce your name again? Yes, Your Honor. Chad White. Okay. How many days would you like to respond? Ten? Ten. I should say again, Your Honor, this just makes the point that the definition we're using is the definition that is correct. All right. Do you want to put that in writing? I will if the court prefers it that way. I'll tell you what. Why don't you take seven days, Mr. Helitz, to give us your supplementation in writing, and then upon filing of that, your court will have ten days to respond. Thank you, Your Honor. Does that make good sense? Go ahead. So we'd ask that the court reverse the circuit court's judgment on all three counts. Thank you, Your Honor. All right. We'll have a few moments after we hear from this gentleman. What's your name? Wayne. Wayne.  Okay. Nothing like a spell. That's very good. Thank you. That's for sure. It's tough. May it please the court, counsel. My name is Chad Hornike. I represent the plaintiff, Dusty's Outdoor Media, in this matter. And I believe that this issue revolves primarily around the interpretation and the definition of the word replace that is used in this particular statute, 225 ILCS 440-3.08. And the lower court's interpretation of that term was that replace means replacing more than 60 percent or more of the wooden uprights with new uprights. This ruling is appropriate because it's consistent with the plain, ordinary meaning of the term when one reads the statute in whole. The department is trying to pick one word out of the statute and go to the dictionary immediately and say, oh, there's a definition that applies for us. That works. But you have to read the context of the statute in the whole to get a determination as to what it means. And in the area, and what the statute really is dealing with substantially, is an arena of repair work. It's providing activities that are considered an erection, construction, building, raising, placing. It is describing what is exempt from those activities in terms of the definition of an erection. And it goes on to then proceed to give a definition of what's not normal maintenance and repair, what is not normal maintenance and repair. So all of this is in the context of repair work. And in the context of repair work, replacement or replacing has an obvious term. In everyday normal life, we see this all the time. If you go to a mechanic and he says, and you go to the mechanic, you have an engine problem, and he says, I replaced your engine, it is obvious what happened. It is replaced with a new item. No person has to go to a dictionary to determine whether or not the replacement was simply repositioning the original item back to its original location. So what about the argument that that position or that reading lies in the face of Lady Bird Johnson's public policy of beautification of the highways? Well, Judge, I believe if you look at the findings, and I understand the outcome case, but the findings, the General Assembly findings, the first paragraph of that statute, does indicate that it's for the beautification. But the second paragraph also provides and legitimizes outdoor advertising as a legitimate business venture that is important for the economy. And so it does provide an explanation that there is some value to outdoor advertising. That value is modified or tempered, I should say, by permits. That's why we have a process in place for that. Correct. Yes, I agree, Your Honor. And in addition, instead of going to generality of the act, we can look specifically at the statute. And the legislature clearly intended for all these acts, for many of these activities, to be exempted in the case of normal maintenance and repair. It's very clear what the legislative intent is in that respect. It's not just tear down every billboard it can possibly tear down. Well, then I think your opponent's argument was then these signs will never go away. And so what is your position with respect to that? Can they just remain forever, kind of got grandfathered in, and be in compliance with the public policy purpose and the statute? Under the statute, if it's in normal maintenance and repair, yes. As long as they can keep it in normal maintenance and repair, and those activities are done pursuant to the statute, then it's as if any other billboard. As long as it's properly maintained, yes, it can exist. But if at some point in time the uprights, over 60 percent of uprights, have to be completely replaced as in a new upright, then I would agree with the Department's interpretation of at least how the statute reads, that the term replaced means new uprights. But I think the statute is the legislative intent. All we can go on at this point is what the statute says, and the statute is very broad what normal maintenance and repair covers in the statute. It covers essentially everything that they say is an erection, building, attaching, raising, constructing, and then the preceding sentences, but none of these activities if it's in the course of normal maintenance or repair. I mean, here you have a situation where these uprights, let's assume maybe they were partially rotted, which is why they were easily going down. Why do they need bracing? If you're just replacing them, putting them back, what's all the bracing about? Well, Your Honor, I don't know the reason for the bracing. What I would say is to keep the uprights up. It's probably to support the billboard. But the Department, my understanding, the Department has never made a determination that bracing is considered part of the uprights, never made a determination that bracing substantially changes the nature of the billboard, that it's routinely done. And in this particular case, they never make the argument that that is the reason why we want to terminate your permit and that this erection is illegal. It's all based upon their definition of the term replacing as it is used in the Act, which is why we would essentially cross motions for summary judgment, because we all agreed upon the substance of facts and that this is strictly an interpretation of what the term replacing means under the Act and under the statute. And I think this can be seen even more when looking at the statute, what we're really talking about here, because, again, reading the full statute provides context as to what replacing means. And the statute provides, of course, for purpose of this definition, the following shall not constitute normal maintenance or repair of a sign or sign structure. And then it lists several items, including the one that's relevant here, replacing of more than 60 percent of the uprights in whole or in part of the wooden sign structure. It then goes on to list several other items that are considered not normal maintenance and repair. But here's a key fact in getting the distinction. The last sentence says, were similar activities that substantially change a sign or make a sign more valuable. And I'm struck by the fact that there's a semicolon before that. So I think it's pretty obvious that it relates back to all the other activities previously numerated. Correct, Your Honor. And so if that's the context in which this is, certainly that could not mean simply pushing the billboard back up with all the same material, with the same materials, the same uprights. And that's considered being replacing under the Act. In addition, Your Honor, this goes into the Keller case, which the Court has previously brought up. And the Department indicates that they don't really believe Keller is relevant in this case so much. I disagree. I think, number one, Keller is still good law. It hasn't been abrogated by statute. The definition of an act of God and the repairs as a result of the damage of an act of God are still relevant and very similar in this case. However, I would point that this amendment, again, it gives insight into what they mean by replacing and substantially changing a sign. As you recall, the billboard, as the Court indicated, the billboard in Keller was completely destroyed beyond repair and constructed with all new materials. And the Court said, without clear legislative expression of clear legislative intent, Department, you can't exceed the bounds of the statute. You can't add more severity, significantly more severity to the statute without express clear intent from the legislature. And that's what this amendment is addressing. It seems it's obvious that that's what it's addressing. When it's talking about replacing more than 60 percent of the uprights in whole or in part of a wooden sign structure, replacing more than 30 percent of the length above ground of each broken, bent, or twisted support. And then it provides, again, these laundry list of items that would make the billboard, these modifications would make the billboard more valuable. And so in light of Keller, this is what they're addressing, is the situation of billboard owners that have a sign that's maybe damaged beyond all repair, repairing a completely new billboard and saying, okay, it's just normal maintenance and repair. I can understand the Department's concern about that, because then you do may have a situation where these billboards will never go away because every time one's dropped down, you build a brand new one, and it's normal maintenance and repair. Do you think Keller, though, distinguished the fact that it was an act of God versus something else? It does. I mean, the Court certainly does. And I think that comes into even taking, I'm taking the Department essentially at their best argument in this case with regards to that, because I do think there's a valid argument, and Keller has a clear issue with the ability of a negligent billboard owner to replace all the way up to 50 percent of their billboard and be fine under the Act, but a billboard owner that has had it damaged by an act of God not be able to replace it. And it becomes even more extreme in this circumstance now, because not only can you not obviously replace a completely new billboard, you can't even raise the thing back up. It's done. If it touches the ground, it's done. You can't re-erect it. Whereas another billboard owner that has been negligent and has three out of six rotted uprights can go in there, put in brand new ones, and be good to go. And so, yes, I believe the act of God argument. And here's the other key distinction is this case has existed for 35 years when the legislature made, after the legislature, or prior to the legislature, I should say, making this amendment. If the legislature intended and had the intent of amending or making clear these acts of God and excluding them because of their concern about the purpose of this act, they had every opportunity to do so. But it makes no mention in the statute of acts of God and doesn't address that issue whatsoever. And as a result, Keller is still a good case law and should be a resource for the court to look at in terms of determining this matter. Finally, if you're looking at the little court's ruling in this matter, its interpretation, the definition, is the only definition that makes this whole statute consistent and intelligible and doesn't result in an unjust enforcement action. The act provides, again, as I mentioned previously, the erect means to construct and then it lists several items, including raise and place. The act then next goes on to say, but it does not include any of this if it's done in normal maintenance and repair. That includes raising assigned structure. So the beginning of the act clearly states you can raise assigned structure as long as with normal maintenance and repair. The department is now arguing that their understanding of the following sentence with regards to replacing means, no, you can't. You can't replace it at all because by the simple act of raising assigned structure, the uprights are naturally going to have to be at the ground at some point, whether it's temporary or momentary or for a significant period of time. So their rendering and their definition makes the statute, it doesn't provide any clear guidance to billboard owners as to what they can possibly do with regards to maintenance and repair of the billboard. And that again goes to the activity of placing. That's essentially the department's argument. The activity of placing by itself is not normal maintenance and repair. Again, that contradicts exactly what the statute says in the first two sentences of the statute. In addition, Your Honors, I believe that their interpretation would lead to some absurd results which the Keller case has made clear to the department as well as the legislature that it will not increase the severity of this act without a clear expression of the legislative intent. And by the department's definition of replacing, they're simply saying that it's to restore to its former place. That does not necessarily mean that the uprights have to be out of the ground. The department could easily make the determination that if a strong gust of wind comes along and moves the uprights askew and the billboard owner came back and pulled it back up, that's restoring to its original place, that's replacing under the act. As a result, that's an illegal erection and, therefore, we can terminate your billboard permit. What they're proposing as to what this statute means would give extreme overbreath and broadness to how the department could interpret whether or not there's been replacing of 60% or more of the uprights. An example would be erosion of the ground underneath the uprights. If the ground eroded under the uprights and the uprights, over 60% of the uprights, had shifted in any manner and the billboard owner, due to safety concerns about staff that are going up to put up the advertising message, shifted it slightly back to the original place, what they're saying is that's replacing. That's replacing more than 60% because you are putting over 60% of the uprights back to its original place. And I don't believe that there's any clear legislative intent for that kind of broadness to be applied to this statute. So, in summary, Your Honors, I believe that the interpretation by the lower court was a correct interpretation and is congruent with the intent of the legislature and that that determination with regards to the granting of summary judgment on the mandamus action should be affirmed. If the Court has any other questions, I'll be happy to entertain them. Thank you. Thank you, Your Honors. Your Honors, my opponent says that the statute does not address whatsoever an act of God, and that ties in with Your Honor's question to me. I think what I need to say with regard to that point is that Section 3.06 does address act of God because it talks about normal maintenance or repair, and an act of God creates a situation where there needs to be some abnormal maintenance or repair. And so the General Assembly did recognize in Keller the act of God idea and said no, it's only good if it's normal maintenance and repair. So my opponent has to say that fixing a billboard that's been knocked over by a storm is normal maintenance and repair. That makes no sense. Second, he says a negligent billboard owner could allow half of the posts to rot away and then restore those posts and not run afoul of the act. But I would point out to the Court that the act does not define what normal maintenance or repair is. It defines what normal maintenance or repair is not. So it sets an upper or lower limit. It is possible for the Department to have taken the position that 50 percent of the uprights need to be restored and with other work this is not normal anymore and that the sign has to come down because this is not a normal maintenance or repair situation. Even though... Wait, you lost me there. So you're saying that they could exceed, they could be below the 60 percent. Yes. If there were facts that would allow the Department to come to the conclusion that this isn't normal maintenance or repair, also statute tells you that if it goes past 60 it's definitely not normal maintenance or repair. So in other words, I think you're kind of in line with what your opponent is saying is the overreaching in the sense that you could say because if it was less than 60 percent and they raised a sign then that would be erection and it would be prohibited by 308. All 308 does is it tells you essentially it's a safe harbor for the Department. If they go past 60 it's definitely not normal maintenance or repair. You're saying that rotting is not normal. I'm saying it's not normal maintenance or repair to repair 6 out of 10. If rotting uprights are allowed to rot away and they bring... That's normal, isn't it? It's normal for wood to rot, but it's not normal to wait until the uprights rot away to replace them. So they have to replace them before they totally rot. That's what you're saying. They have to replace them regularly. I mean, I think the idea of normal is that it's normal in time and it's normal in scope. And so, but that's not what they did here. I don't care what they did here. I'm just asking what you think. I'm saying normal is... Normal is replaced before they totally rot. Certainly. So that's normal. It would have to be because if it wasn't, if we waited until it totally rotted, signs would be falling down all the time and that would be dangerous. So there has to be normal maintenance and repair to make sure the signs are in good order. And if the signs are repaired in a way that's abnormal or unusual or after an act of God, that's not normal maintenance or repair. Well, it is kind of hard to prevent some act of God. So, again, that's just bad luck. If the sign comes down and needs to be replaced through something that's not normal maintenance or repair, this exception won't apply. Except that would, I guess, raising a sign back up that was knocked down by an act of God might be normal under those circumstances. Would you agree with that? No, Your Honor. I think an act of God is defined by its abnormality. No, no. I'm talking about the actual then raising and the maintenance and repair, what you would do under an act of God would be considered normal. I think it would be repair and it would be repair. It wouldn't be maintenance. It would be the repair of the sign, but it would not be normal. And that language was added by the General Assembly after Keller. So I would tie the question about acts of God and what the General Assembly said in this act to that word normal. I don't see where using the word normal would in any way knock out what you would do after an act of God and consider it an abnormal reaction to an act of God. I don't see that in the reading of that sentence. To draw the analogy that my opponent raised about taking care of an engine, normal maintenance and repair of an engine is oil change, tire changes, things that are scheduled, things that are anticipated to wear before the life of the car is over. But if the car is in an accident, say it gets blown over by a windstorm, you have to do something to fix the car. That's not going to be normal maintenance and repair. That would be repair, but it won't be normal. Let me just ask one question for her. It is still your argument that a sign that is blown over, it's laying on the ground, you're saying putting it back in an upright position equals replace it. Is that what you're saying? I am, Your Honor. That's consistent. Okay. That's all I want to know. That's consistent with the dictionary definition. If I could just conclude by... I'm sorry. You're out. Thank you very much, Your Honor. Thank you. We'd have to put it reverse. Your Honor, I would like to put it to your attention that the last case today, there was a student who was the athlete. In this case? At the last case. So would it be 404? In the first case? The last case. In the last case of the day? That would be 404, the 10 o'clock case. Okay. Rupert Reese's Wellness? Rupert. Okay. When we reach that, we'll take care of it. Thank you. All right. With regard to 518-0269, we'll take the matter under advisement. Thank you.